**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>YUE CAO,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:24-cr-00151<br><br>Judge J. Philip Calabrese<br><br>Magistrate Judge<br>James E. Grimes, Jr. |

**OPINION AND ORDER**

Following a four-days trial, a jury convicted Defendant Yue Cao of ten counts of bank fraud, four counts of aggravated identity theft, and one count of engaging in monetary transactions in criminally derived property. Defendant moves for a judgment of acquittal or, in the alternative, for a new trial. For the reasons that follow, the Court **DENIES** that motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 1, 2024, a grand jury charged Yue Cao with eleven counts of bank fraud, five counts of aggravated identity theft, and one count of engaging in monetary transactions in criminally derived property. (ECF No. 1.) The indictment alleged that Mr. Cao was a quantitative modeling analyst who worked remotely at two different banks and that he used his access to the banks' customer data to misuse customers' personal information and transfer customer funds into accounts under his own control. (*Id.*) The scheme compromised the bank accounts of five individual victims. (*Id.*, PageID #17–18.)

When the case proceeded to trial, Mr. Cao faced fifteen charges pursuant to an amended indictment. (ECF No. 43-1.) At trial, he faced ten counts of bank fraud under 18 U.S.C. § 1344 for ten allegedly unauthorized transactions in which funds were transferred from a victim's bank account either to an unauthorized financial account in the victim's name or to an account belonging to Mr. Cao. (*Id.*, ¶ 14, PageID #246–49.) These counts implicated the bank accounts of four individual victims. (*Id.*) For each of the four victims, Mr. Cao faced one count of aggravated identity theft under 18 U.S.C. § 1028A(a)(1). (*Id.*, ¶16, PageID #249–50.) Additionally, he faced one count of engaging in monetary transactions in criminally derived property under 18 U.S.C. § 1957 for the transfer of $50,000 of funds from victims between two of Mr. Cao's own accounts. (*Id.*, ¶18, PageID #250.)

### A. Pretrial Motions

In the months following the indictment, one of the five victims, a man in his 90s who was identified in the charging documents as "Victim 3," made inconsistent statements to the Federal Bureau of Investigation regarding whether he authorized one of the four transactions that investigators previously deemed fraudulent. (ECF No. 14, PageID #92–93.) Subsequently, the banking institution determined that an individual calling from Victim 3's telephone number initiated the transaction in question. (*Id.*, PageID #93.) In response to this development, and to the uncertainties presented by "the post-indictment wavering statements of a very elderly Bank 1 customer," the United States moved to dismiss the two counts against Mr. Cao that concerned Victim 3's bank accounts. (ECF No. 15, PageID #99.) The Court granted that motion, dismissing counts 6 and 14 of the original indictment. (ECF No. 17.)

As these events unfolded, Defendant moved to compel the disclosure of grand jury transcripts. (ECF No. 11.) Citing what had happened with Victim 3, he asserted that there was "a strong likelihood that false or misleading information was provided to the grand jury, either recklessly or intentionally." (*Id.*, PageID #67.) Additionally, he sought access to the grand jury transcript to "ensure whether the grand jury was a fair proceeding, to research and prepare pretrial motions to dismiss, and to enable the adequate preparation of a defense." (*Id.*, PageID #69.) The Court held oral argument on this matter before denying Defendant's motion. (ECF No. 17; Minutes of Proceedings, April 15, 2025.)

In the weeks before trial, both parties filed motions *in limine*. In relevant part, Defendant moved to exclude mention of the fact that several victims were now deceased and to exclude hearsay statements of non-victim witnesses. (ECF No. 36, PageID #207–13.) The United States moved to exclude mention of Victim 3 and the counts in the original indictment relating to him. (ECF No. 38.) At the final pretrial conference, the Court resolved these motions. (ECF No. 49.) There, the Court granted the motion of the United States to exclude testimony regarding Victim 3 and denied Defendant's motion to exclude the fact that some victims were now deceased. (*Id.*) Specifically, the Court determined that the United States might elicit the fact that a victim died to explain why the victim was not testifying, and the Court would instruct the jury not to draw any negative inferences from the victims' deaths. Additionally, Defendant withdrew as moot his motion to exclude hearsay from "non-

alleged victim witnesses" because the United States did not use any such statements. (*Id.*)

### B. The Evidence at Trial

The trial centered on fraudulent transactions affecting the bank accounts and personal information of eight elderly KeyBank customers: Beverly Gakeler, Rose Roedel, Alice Pettigrew, Betty Stafford, Irving Halpern, Jane Mehlenbacher, Helen Helinski, and Carmen Reynolds. The United States presented records from several banking and brokerage entities, including KeyBank, Charles Schwab, Robinhood, Tastytrade, Citi Bank, and InComm Financial Services, as well as online access records that Charles Schwab and Tastytrade maintained. Additionally, the United States presented testimony from representatives and fraud investigators associated with KeyBank, Charles Schwab, Tastytrade, and InComm Financial Services. Defendant did not call any witnesses.

At trial, the evidence established the following facts. Mr. Cao worked as a quantitative analyst in the banking industry, where he used his skills in data analytics and model development to support financial crimes prevention and detection. (USA Ex. 828.) From 2015 to 2022, he worked for KeyBank. (*Id.*) In June 2022, he left KeyBank and joined Charles Schwab as a senior manager. (*Id.*) In both roles, Mr. Cao worked remotely from his home near Chicago, Illinois. In his work, he had access to the personal data of bank customers, including their contact information, social security numbers, account numbers, and balances.

### B.1. Alice Pettigrew

On May 4, 2022, 92-year-old KeyBank customer Alice Pettigrew was enrolled in online banking by someone who knew her name, social security number, and bank account number. The username to her online banking account was comprised of her first initial, middle initial, full last name, and year of birth. The email address associated with her online account used this same naming convention and was hosted by GMX.com.

On June 22, 2022, an account was opened in Pettigrew's name at the online brokerage firm Tastytrade. (USA Ex. 702.) Then, this account was linked to her KeyBank account, and $10,000 was transferred out of her KeyBank account on June 23, 2022, on July 11, 2022, and again on July 28, 2022. (USA Ex. 704; USA Ex. 708.) The charges against Mr. Cao included three counts of bank fraud for these three transactions, as well as one count of aggravated identity theft involving Pettigrew.

Login records revealed that Pettigrew's Tastytrade account was accessed from a variety of IP addresses that could not be traced but which were associated with the AT&T cell phone network to which Mr. Cao subscribed. (USA Ex. 712.) Additionally, the account settings and trading preferences in Pettigrew's Tastytrade account matched those in Mr. Cao's Tastytrade account. (USA Ex. 704; USA Ex. 700.) Subsequent analysis of the trading activity conducted in Pettigrew's Tastytrade account and in Mr. Cao's indicated that the two brokerage accounts sold stock options to each other. (USA Ex. 715a; USA Ex. 716a.) This trading pattern was consistent with a recognized technique for moving funds between two brokerage accounts. At some point, Pettigrew noticed unauthorized activity and reported it to the police.

### B.2. Jane Mehlenbacher

On May 4, 2022, the same day as Pettigrew's online banking enrollment, 93-year-old Keybank customer Jane Mehlenbacher was enrolled in online banking by someone who knew her name, social security number, and bank account number. As with Pettigrew, Mehlenbacher's account username was comprised of her first initial, middle initial, full last name, and year of birth. Her account was associated with an email address using this same naming convention and hosted by GMX.com.

Mehlenbacher died on May 12, 2022, and her online banking account remained inactive until September 26, 2022, when someone initiated test transactions to link her KeyBank accounts with Mr. Cao's bank and trading accounts at PayPal, Charles Schwab, and Robinhood. (USA Ex. 410; United States Ex. 201.) One of Mehlenbacher's KeyBank accounts was successfully linked to Mr. Cao's Schwab account, but the link was cancelled on October 21, 2022. (USA Ex. 201.) Login records from Charles Schwab later indicated that the link between Mehlenbacher's Keybank account and Mr. Cao's Schwab account was initiated and canceled through activity occurring on an IP address assigned to Mr. Cao's home internet. (USA Ex. 301a; USA Ex. 836; ECF No. 64, ¶ 3, PageID 615.)

### B.3. Helen Helinski

Along with Pettigrew and Mehlenbacher, 101-year-old KeyBank customer Helen Helinski was enrolled in online banking on May 4, 2022. As with them, Helinski's account username used her first initial, middle initial, full last name, and year of birth. Her account was associated with an email address using this same naming convention and hosted by GMX.com.

On May 8, 2022, someone attempted to use Helinski's name and a GMX-based email address to open a prepaid debit card account at the Bluebird website managed by InComm Financial Services. (USA Ex. 600.) This attempt failed because, to prevent fraud, the website routinely rejects applications that use GMX-based email addresses.

On May 9, 2022, Helinski's name and information was used to open an online Barclays savings account. (USA Ex. 840.) On May 12 and 13, there were three large fund transfers out of Helinski's KeyBank accounts and into this new Barclays account. (USA Ex. 403; USA Ex. 404.) These transfers involved $350,000, $142,008.53, and $67,807.47. (USA Ex. 403; USA Ex. 404.) For these three transactions, Mr. Cao was charged with three counts of bank fraud as well as one count of aggravated identity theft involving Helinski. (ECF No. 43-1.)

On June 1, 2022, Helinski's name was used to open a brokerage account on the online platform of Tastytrade, and this Tastytrade account was then linked to the Barclays account. (USA Ex. 703; USA Ex. 805.) Thirteen days later, $100.52 was transferred from the Barclays account into the Tastytrade account. (USA Ex. 805.)

On June 10, there were two more failed attempts to open a Bluebird card in Helinski's name. (USA Ex. 601; USA Ex. 602.) But on July 28, 2022, a Bluebird card was successfully opened in her name using an Outlook-based email address. (USA Ex. 603.) After her address and personal information were verified through the Bluebird website, an online user updated her mailing address to Mr. Cao's home address and requested that a new Bluebird card be mailed there. (*Id.*) After the card

was activated by someone in physical possession of it, the mailing address in Helinski's Bluebird account was changed back to the one historically associated with her. (*Id.*) Through the U.S. Post Office's informed delivery service, Mr. Cao's email address received images of a Bluebird envelope addressed to Helinski for delivery to his home address. (USA Ex. 806; USA Ex. 807.)

In September 2022, there were numerous unauthorized online transfers between Helinski's KeyBank accounts. (USA Ex. 403; USA Ex. 404.) But on October 3, 2022, Helinski's KeyBank checking account was linked to Mr. Cao's bank account at Charles Schwab through the initiation and confirmation of test transactions between the two accounts. (USA Ex. 404.) Later, the linkage was canceled on October 6, 2022. (*Id.*) Both the linkage and its cancelation were initiated within Mr. Cao's Schwab account and occurred either on Mr. Cao's home IP address or through a device print that Schwab login records associated with Mr. Cao's cell phone. (USA Ex. 301; USA Ex. 836.)

**B.4. Irving Halpern**

On May 5, 2022, 95-year-old KeyBank customer Irving Halpern was enrolled in online banking. His account username and GMX-based email address followed the same conventions previously described. On October 13, $100,000 was transferred from Halpern's KeyBank savings account to his checking account. (USA Ex. 414.) On October 26, Halpern's checking account was linked to Mr. Cao's personal brokerage account at Tastytrade. (*Id.;* USA Ex. 706.) The linkage was canceled later that same day. (USA Ex. 706.) Mr. Cao's email address received messages from Tastytrade acknowledging these changes. (USA Ex. 825.)

### B.5. Carmen Reynolds

On May 18, 2022, 92-year-old Carmen Reynolds was enrolled in online banking using the same naming conventions for her account username and her GMX-hosted email address. On July 12, two attempts to open a Bluebird account in her name failed because the application included a GMX email address. (United States Ex. 605; United States Ex. 604.) Two days later, a third Bluebird application in her name succeeded using a different email address. (United States Ex. 606.) After her personal information was verified through the Bluebird website, an online user updated her mailing address to Mr. Cao's home address and requested that a new Bluebird card be mailed there. (*Id.*) After her Bluebird card was activated by someone in physical possession of it, the mailing address listed on her Bluebird account was changed back to the one historically associated with. Reynolds. (*Id.*) Through the U.S. Postal Service Informed Delivery service, Mr. Cao's email address received images of the mail which was addressed to Reynolds and headed to his home. (United States Ex. 826; United States Ex. 827.)

### B.6. Beverly Gakeler

On September 29, 2022, 103-year-old KeyBank customer Beverly Gakeler enrolled in online banking. Her username and GMX-hosted email address followed the same naming conventions described above. On October 3, 2022, the stocks in her KeyBank brokerage account were liquidated for $247,888.54. (USA Ex. 100.)

On October 27, 2022, an application for a Bluebird account in Gakeler's name was declined because the application included a GMX-hosted email address. (USA Ex. 608.) The next day, another Bluebird application, using a non-GMX email

address, was successful. (USA Ex. 609.) After the Bluebird website verified her personal information, an online user updated Gakeler's mailing address to Mr. Cao's home address and requested that a replacement debit card be sent there. (*Id.*) After the card was activated by someone in physical possession of it, an online user changed the mailing address in Gakeler's Bluebird account back to the one historically associated with her. (*Id.*) Through the U.S. Postal Service's informed delivery service, Mr. Cao's email address received images of the mail addressed to Gakeler for delivery at Mr. Cao's home. (USA Ex. 803.)

On December 21 and 23, $100 and then $5,000 was transferred from Gakeler's KeyBank brokerage account to her checking account. (USA Ex. 101.) On January 4 and 6, 2023, $100 and then $5,000 was transferred from Ms. Gakeler's checking account to Mr. Cao's Schwab account. (*Id.*) Since his account began that month with a balance of $5.30, this $5,100 comprised the bulk of the funds in Mr. Cao's Schwab account. (USA Ex. 202.)

On January 9, 2023, $50,000 was transferred from Ms. Gakeler's brokerage account to her checking account. (USA Ex. 401.) On February 3, $50,000 was transferred from her checking account to Mr. Cao's Schwab account, raising his balance from $1.32. (USA Ex. 401; USA Ex. 202.) Within Mr. Cao's Schwab accounts, the sums of $5,100 and $50,000, received from Gakeler's account, were transferred to Mr. Cao's brokerage account and used for options trading. (USA Ex. 203.) His email address received a statement reporting his account's trading activity. (USA Ex. 839.)

On March 16, another $50,000 was transferred from Gakeler's brokerage account to her checking account. (USA Ex. 401.)

Schwab login records indicated that the linkage between Gakeler's account and Mr. Cao's, as well as all of the fund transfers from her account to his, were initiated through online activity occurring on his home IP address and on the device print associated with his cell phone. (USA Ex. 300a; USA Ex. 836.)

The charges against Mr. Cao included one count of bank fraud for the transfer of $5,000 on January 6, 2023 from Gakeler's account into his own, one count of bank fraud for the transfer of $50,000 on February 3 from Gakeler's account into his own, and one count of aggravated identity theft involving Gakeler. (ECF No. 43-1.) Also, Mr. Cao was charged with one count of engaging in monetary transactions in criminally derived property for the transfer on February 9 between Mr. Cao's accounts of $50,000 belonging to Gakeler. (*Id.*)

**B.7. Betty Stafford**

On October 6, 2022, 95-year-old KeyBank customer Betty Stafford was enrolled in online banking using the same naming conventions for her username and a GMX email address. On November 22, 2022, test transactions were initiated to link Stafford's KeyBank account to Mr. Cao's brokerage account at Tastytrade. (USA Ex. 411; USA Ex. 412.) Mr. Cao's email address received a confirmation email regarding this linkage. (USA Ex. 823.) On April 17, 2023, an attempt to link Stafford's KeyBank account with Mr. Cao's Schwab account failed because Schwab had transitioned to a new system that no longer allowed linkage with external accounts that did not belong to the same account holder. (USA Ex. 301.) This activity

was initiated within Mr. Cao's online Schwab account and hosted on either his home IP address or the device print associated with Mr. Cao's cell phone. (USA Ex. 301; USA Ex. 300a; USA Ex. 836.)

**B.8. Rose Roedel**

KeyBank customer Rose Roedel passed away in 2020, and her passing was not reported to KeyBank. However, on November 27, 2022, her KeyBank accounts were enrolled in online banking using the same naming convention and a GMX account. On November 28, $966.75 was transferred from her savings account to her checking account. (USA Ex. 406.) On November 30 and December 1, her account was used to make two payments to Mr. Cao's Citibank credit card. Those payments were in the amounts of $2,352.51 and $3,059.55, respectively. (USA Ex. 406; USA Ex. 810; USA Ex. 809.) On December 7 and 9, $50,000 and then $48,000 were transferred from her savings account to her checking account. (USA Ex. 406.) The charges against Mr. Cao included two counts of bank fraud for the two payments made to Citibank from Roedel's account, as well as one count of aggravated identity theft involving Roedel.

On December 12, 2022, Ms. Roedel's name was used to open a Bluebird prepaid debit card account. (USA Ex. 611.) Once her information was verified, an online user updated her mailing address to Mr. Cao's home address and requested that a new card be sent there. (*Id.*) After the card was activated by someone in physical possession of it, the mailing address on Roedel's Bluebird account was changed back to the one historically associated with her. (*Id.*)

* * *

In March 2023, Gakeler contacted KeyBank to report unauthorized activity in her accounts. (USA Ex. 103; ECF No. 60, PageID #426–28.) KeyBank investigators reached out to Schwab regarding the $55,100 that had been transferred out of Ms. Gakeler's account and into a Schwab account. (ECF No. 60, PageID #426–28.) Schwab investigators shared that the funds went to a single account holder, Mr. Cao. (*Id.*, PageID #428–30.) When bank investigators learned that Mr. Cao was a current Schwab employee and a former KeyBank employee, they expanded the collaborative investigation and identified other, similarly affected KeyBank customers. (*Id.*, PageID #429–30; USA Ex. 201.) They found that many of the transactions involved IP addresses that were untraceable due to VPN use. However, Schwab login activity reflected that some of the access to Mr. Cao's account, which occurred through a VPN, could also be tied to the device print associated with his cell phone. (USA Ex. 836.)

On April 18, 2023, Schwab investigators met with Mr. Cao remotely to confront him regarding the funds he received from Gakeler's accounts. (ECF No. 60, PageID #463–65; USA Ex. 207.) Mr. Cao denied knowledge of Gakeler or the transactions in question and indicated that he had not closely reviewed his bank accounts for the past two months. (*Id.*; ECF No. 60, PageID #466–71.) Also, he also suggested that his accounts might have been hacked when he traveled to Costa Rica in December 2022. (ECF No. 60, PageID #471–72.) Mr. Cao could not explain why much of the suspicious activity occurred on his home IP address. (*Id.*, PageID #474–76.)

Schwab investigators concluded that the suspicious activity between Mr. Cao and KeyBank customers was unrelated to debit card fraud Mr. Cao experienced on a

previous Schwab account. (*Id.*, PageID #514–16.) Upon further analysis, they determined that Mr. Cao's login data was not consistent with a hacked account. (*Id.*, PageID #515–16.) Based on the results of this internal investigation, Mr. Cao's employment at Charles Schwab was terminated on April 20, 2023. (Id., PageID #478–79.) Around this same time, KeyBank reported its findings to the FBI.

On April 18, 2023, shortly after Schwab's confrontation with Mr. Cao, the linkage between Mr. Cao's Tastytrade account and Stafford's KeyBank account was canceled. (USA Ex. 706.) A week later, Mr. Cao filed an FBI complaint, which reported Schwab's accusations and explained that he might have been hacked. (USA Ex. 833.)

C. **Hearsay Objections**

At trial, KeyBank fraud investigator Stacy Ebert testified that KeyBank's internal investigation began after Gakeler reported the activity in her account as unauthorized transactions. As part of Ebert's testimony, over Defendant's objections, she read aloud a KeyBank email thread which described Gakeler's fraud complaint. (USA Ex. 103.) Defendant also objected to Ebert's testimony that Gakeler did not enroll herself in online banking and she did not authorize anyone to conduct transactions on her behalf. Further, Ebert testified that Gakeler did not own a computer or use an email address. The Court overruled Defendant's objections to Ebert's testimony on these points.

**D. Jury Instructions**

In the week preceding trial, the parties jointly proposed jury instructions. (ECF No. 51.) The Court reviewed this proposal and returned a revised draft to the

parties for their review. Before closing arguments, the Court held a charge conference to finalize the jury instructions.

The final drafted instruction for Count 15, Engaging in Monetary Transactions in Property Derived From Specific Unlawful Activity, followed the Sixth Circuit's pattern instruction but indicated the specific transaction alleged to constitute this offense. *See* Pattern Crim. Jury Instr. 6th Cir. 11.06 (2025).

> **COUNT 15: ELEMENTS OF ENGAGING IN MONETARY TRANSACTIONS IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY**
>
> Count 15 of the indictment charges the defendant Yue Cao with engaging in a monetary transaction in property derived from specified unlawful activity in violation of Title 18, United States Code, Section 1957.
>
> The government alleges that Defendant committed this crime on or about February 9, 2023, by transferring $50,000 from Defendant's Charles Schwab checking account to Defendant's Charles Schwab brokerage account.
>
> For you to find the defendant guilty of this crime, you must find that the government has proved each and every one of the following elements beyond a reasonable doubt:
>
> *First*, the defendant knowingly engaged in a monetary transaction.
>
> *Second*, the monetary transaction was in property derived from specified unlawful activity.
>
> *Third*, the property had a value greater than $10,000.
>
> *Fourth*, the defendant knew that the transaction was in criminally derived property.
>
> *Fifth*, the monetary transaction took place within the United States.

(ECF No. 64, PageID #607.)

Defendant objected to this instruction, arguing that by indicating which transaction was at issue in this charge, the Court lowered the burden of proof. The Court overruled this objection, finding that it did not undermine the burden of proof and instead provided clear instruction in a case that involved numerous transactions. When Defendant suggested that jurors could consult the indictment for any necessary clarification, the Court explained that the jurors would not receive a copy of the indictment to ensure that they did not interpret it as evidence against Mr. Cao.

Where the instructions defined Aggravated Identity Theft, they followed the Sixth Circuit's pattern instruction and included its definition of possession. *See* Pattern Crim. Jury Instr. 6th Cir. 2.10 & 15.04 (2025).

> Next, I want to explain something about possession. The government does not necessarily have to prove that the defendant physically possessed the means of identification for you to find him guilty of this crime. The law recognizes two kinds of possession—actual possession and constructive possession. Either one of these, if proved by the government, is enough to convict.
>
> To establish actual possession, the government must prove that the defendant had direct, physical control over the means of identification, and knew that he had control of it. To establish constructive possession, the government must prove that the defendant had the right to exercise physical control over the means of identification, and knew that he had this right, and that he intended to exercise physical control over means of identification at some time, either directly or through other persons.
>
> For example, if you left something with a friend intending to come back later and pick it up, or intending to send someone else to pick it up for you, you would have constructive possession of it while it was in the actual possession of your friend.
>
> But understand that just being present where something is located does not equal possession. The government must prove that the defendant had actual or constructive possession of the means of

> identification, and knew that he did, for you to find him guilty of this crime. This, of course, is all for you to decide.

(ECF No. 64, PageID #605–06.)

Defendant objected to including this definition, arguing that the United States never suggested the possibility of constructive possession and that the jurors might interpret Mr. Cao's access to sensitive bank data as constructive possession. In response, counsel for the United States explained that they had consistently suggested digital possession. The Court overruled Defendant's objection, noting that possession of digital data is not specifically addressed by the law and that the legal meaning of possession encompasses both actual and constructive possession. For these reasons, the Court determined that the jury ought to weigh the evidence in this case against the full legal definition of possession.

The final jury instructions did not include an instruction against drawing negative inferences from the victims' deaths, which was discussed at the final pretrial conference. Neither party pointed out this omission.

## ANALYSIS

Defendant filed a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure and, in the alternative, for a new trial pursuant to Rule 33. (ECF No. 68.) The Court addresses each argument in turn.

### I. Motion for a Judgment of Acquittal (Rule 29)

Under Rule 29, a court may set aside a verdict and enter a judgment of acquittal. Fed. R. Crim P. 29(c)(2). It may do so only where "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). On a motion under

Rule 29, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). In analyzing this question, it is the job of the jury—not a court—"fairly to resolve conflicts in the testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020) (quoting *Jackson*, 443 U.S. at 319).

Under this standard, even a trial court, which heard the testimony of witnesses firsthand, does not weigh the evidence or judge the credibility of witnesses. *Burks v. United States*, 437 U.S. 1, 16 (1978); *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018) (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)). A court draws all reasonable inferences in favor of the jury's verdict. *United States v. Bowens*, 938 F.3d 790, 794 (6th Cir. 2019) (citation omitted). And it determines whether a reasonable mind might fairly find guilt beyond a reasonable doubt based on the record as a whole. *United States v. Fawaz*, 881 F.2d 259, 261 (6th Cir. 1989); *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984).

Defendant seeks a judgment of acquittal on all counts, arguing that, "the jury could not have found that Mr. Cao was responsible for the underlying bank fraud scheme beyond a reasonable doubt." (ECF No. 68, PageID #639.) He points out that no witness testified to "any first-hand observation of Mr. Cao creating any bank accounts, conducting any bank transfers, or activating any Bluebird cards." (*Id.*,

PageID #640.) Also, he points out that the United States did not obtain or present evidence of stolen KeyBank data on Mr. Cao's electronic devices. (*Id.*, 641.) At bottom, Defendant maintains that there was insufficient evidence identifying him as the perpetrator of the charged conduct: "[i]n totality, the evidence did not prove beyond a reasonable doubt that Mr. Cao was the individual behind any of the unauthorized transactions." (*Id*, PageID #638.)

**I.A. Beverly Gakeler (Counts 1, 2, 11, and 15)**

The jury convicted Defendant of four charges involving Beverly Gakeler: two counts of bank fraud (Count 1 and Count 2) for performing two unauthorized transactions transferring a total of $55,000 from her account into Mr. Cao's Schwab checking account; one count of aggravated identity theft (Count 11) for unauthorized transfer, possession, or use of Gakeler's identification in relation to bank fraud; and one count of engaging in monetary transactions in criminally derived property (Count 15) for intentionally transferring $50,000 between two of Mr. Cao's accounts when he knew that money was obtained from Gakeler through criminal means. (ECF No. 64.)

At trial, the evidence showed that Mr. Cao had access to Gakeler's personal and financial information through his work at KeyBank and that he was the sole beneficiary of the unauthorized transactions affecting Gakeler's KeyBank accounts. When Schwab investigators questioned Mr. Cao on April 18, 2023, he insisted that he was unfamiliar with Gakeler and unaware that her money had entered his account. At that time, however, the $55,100 transferred to Mr. Cao would have been quite noticeable considering that his bank account otherwise contained $5.30. Mr. Cao's professed ignorance of Gakeler's $55,100 also stands at odds with the fact

that this same money was transferred from his checking account into his brokerage account and used for options trading. Additionally, the Schwab login records reflect that Mr. Cao's home IP address and cell phone were used for at least some of the unauthorized transactions. From these facts, a rational jury could find that Mr. Cao was responsible for the activity in question.

Further, the United States presented evidence that fraudulent use of Gakeler's personal information resulted in the mailing of a prepaid Bluebird debit card in her name to Mr. Cao's home. (USA Ex. 608; USA Ex. 609.) A recipient activated the Bluebird card. (USA Ex. 609.) The fact that additional misuse of Gakeler's personal data involved Mr. Cao's home address permitted the jury to find that Mr. Cao not only knew of the fraudulent activity targeting Gakeler but was actively involved in its commission. Although other explanations might account for these facts, a rational jury need not accept them. The evidence suffices to support the verdict on Counts 1, 2, 11, and 15.)

### I.B. Helen Helinski (Counts 3, 4, 5, and 12)

The jury convicted Defendant of four charges involving Helen Helinski: three counts of bank fraud (Count 3, Count 4, and Count 5) for transferring $250,000.00, $142,008.53, and then $67,807.47 from her KeyBank accounts into an unauthorized Barclays account in her name; and one count of aggravated identity theft (Count 12) for unauthorized transfer, possession, or use of Ms. Helinski's identification in relation to bank fraud.

As with Beverly Gakeler, Mr. Cao had access to Helinski's personal and financial information through his work at KeyBank. Although none of Mr. Cao's

personal accounts directly received Helinski's funds, her account was linked to Mr. Cao's checking account before that linkage was canceled. The Schwab login records, which indicate that these actions were initiated from Mr. Cao's home IP address or from his cellphone, suggest that Mr. Cao was not only aware of this activity but personally responsible for it. Helinski's name was also used to open an account at Tastytrade, a brokerage platform Mr. Cao used.

As with Beverly Gakeler, a Bluebird card was ordered in Helinski's name that was then mailed to Mr. Cao's home address and activated. Overall, the fraudulent activity in Helinski's account bore sufficient connections to Mr. Cao for a rational jury to find that he was responsible for this fraud and to return verdicts of guilty on Counts 3, 4, 5, and 12.

### I.C. Rose Roedel (Counts 6, 7, and 13)

The jury convicted Defendant of three charges involving Rose Roedel: two counts of bank fraud (Count 6 and Count 7) for two payments from Ms. Roedel's bank account to Mr. Cao's Citibank credit card; and one count of aggravated identity theft (Count 13) for unauthorized transfer, possession, or use of Roedel's identification in relation to bank fraud.

As with the other victims, Roedel's personal financial information was accessible to Mr. Cao through his employment at KeyBank, and the fraudulent misuse of her name and assets began within her KeyBank accounts. With the payments of $2,352.51 and $3,059.55 from Roedel's account to Mr. Cao's Citibank credit card, Defendant benefitted from the unauthorized activity. And as with the other victims, a Bluebird card in Roedel's name was mailed to Mr. Cao's house and

activated. Because Defendant was the beneficiary of Ms. Roedel's payment to Citibank and his home address received the Bluebird card bearing her name, rationale jurors could (and did) fairly conclude that Mr. Cao was actively aware of, and involved in, the fraudulent activity. Therefore, sufficient evidence supports Defendant's conviction on these counts.

### I.D. Alice Pettigrew (Counts 8, 9, 10, and 14)

The jury convicted Defendant of four charges involving Alice Pettigrew: three counts of bank fraud (Count 8, Count 9, and Count 10) for three $10,000 transfers from Ms. Pettigrew's KeyBank account to an unauthorized Tastytrade account in her name; and one count of aggravated identity theft (Count 14) for unauthorized transfer, possession, or use of Pettigrew's identification in relation to bank fraud.

The unauthorized Tastytrade account created in Ms. Pettigrew's name not only matched the settings and trading preferences in Mr. Cao's account and in Helinski's unauthorized Tastytrade account, but it also engaged directly with Mr. Cao's account, selling stock options in a manner that effectively moved funds from her brokerage account to his. Additionally, Pettigrew's financial victimization began with her enrollment in online banking on May 4, 2022, the same day that Mehlenbacher, Helinski, and Halpern were enrolled in online banking. This evidence permitted a rational jury to find that Mr. Cao misused Pettigrew's personal information and assets and suffices to sustain Defendant's conviction on these counts.

* * *

Taken as a whole, the evidence suggested a pattern of organized and deliberate bank fraud targeting a number of potential victims whose names Mr. Cao could access

in his employment. The scheme required brokerage accounts and knowledge of options trading, which Mr. Cao had, and it used the websites and platforms he employed in his personal financial dealings. Several of the transactions involved Mr. Cao's residential address, IP address, and his own financial accounts. Again, other explanations might account for this body of evidence. But this evidence justifies a rational jury in finding Mr. Cao guilty on each count at trial. For these reasons, the Court **DENIES** Defendant's motion for a judgment of acquittal under Rule 29.

## II. Motion for a New Trial (Rule 33)

In the alternative, Mr. Cao asks for a new trial under Rule 33. This Rule gives a court discretion to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Motions for a new trial are not favored and are granted only with great caution." *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976) (citing *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967)).

A motion for a new trial involves a more generous standard of review than a motion under Rule 29. *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir. 1980). "[I]t is widely agreed that Rule 33's 'interest of justice' standard allows the grand of a new trial where substantial legal error has occurred." *United States v. Munoz,* 605 F.3d 359, 373 (6th Cir. 2010). Substantial legal error includes "any error of sufficient magnitude to require reversal on appeal." *United States v. Dimora*, 879 F. Supp. 2d 718, 724 (N.D. Ohio 2012) (citation omitted).

However, "[t]he paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that the jury's verdict was against the manifest weight of the evidence," though the evidence may be legally sufficient for a finding of guilt. *Munoz,* 605 F.3d

at 373 (citation omitted); *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007). To address such a motion, the court may act as a thirteenth juror, assess the credibility of witnesses, and weigh the evidence. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). Still, "such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Hughes*, 505 F.3d at 593 (quoting *Turner*, 490 F. Supp. at 593). The court's role seeks to insure against a miscarriage of justice, *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988), such as where the judge disagrees with the jury's resolution of conflicting evidence, *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

Defendant moves for a new trial under Rule 33, asserting both substantial legal error and that the verdict is against the manifest weight of the evidence. (ECF No. 68.) He advances numerous arguments: (1) the verdict was against the weight of the evidence, (2) the Court erred in granting the motion of the United States to exclude evidence concerning Victim 3, (3) the Court erred in denying Defendant's motion to compel grand jury transcripts, (4) the Court erred in denying Defendant's motion to exclude testimony that some victims were deceased and in not providing a limiting instruction, (5) the Court erred in allowing testimony to contain hearsay statements from the victims, (6) the Court erred by including the definition of constructive possession in the jury instruction for aggravated identity theft (Counts 11 through 14), (7) the Court erred by indicating the subject transaction in the jury instruction for Count 15, and (8) the cumulative effect of these errors produced an unfair trial. (ECF No. 68, PageID #647–62.)

**II.A. Manifest Weight of the Evidence**

In this case, the Court has thoroughly analyzed Defendant's arguments concerning sufficiency and weight of the evidence. Based on its experience hearing the evidence while presiding at trial and its post-trial review of the record in connection with the current motions, the Court cannot say that the interests of justice require a new trial, the jury's verdicts are against the manifest weight of the evidence, or the verdicts otherwise depend on facts, inferences, or other evidentiary findings that call the verdicts into question. Therefore, the Court declines to exercise its discretion to order a new trial on these grounds.

**II.B. Grand Jury Transcript**

Defendant argues that the Court's denial of his pretrial motion to compel the disclosure of grand jury transcripts (ECF No. 11) constitutes substantial legal error warranting a new trial under Rule 33. In Defendant's view, there was no need for grand jury secrecy at the time of his motion to compel, and the transcript contained statements regarding Victim 3 which could be used to impeach the FBI investigator based on information that emerged after the indictment and led to dismissal of the charges involving Victim 3. (ECF No. 68, PageID #651–53.)

However, Defendant does not demonstrate that this interest overcomes the "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts." *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958) (citations omitted). As the Court previously explained, a party requesting a grand jury transcript must demonstrate a "particularized need" for the transcript for the secrecy of the proceedings to be lifted in a limited manner. *Pittsburgh Plate Glass*

*Co. v. United States*, 360 U.S. 395, 400 (1959). A particularized need requires a showing that the defendant's need for the material outweighs the interest in continued secrecy and that the request is tailored only to the material needed. *See In re Antitrust Grand Jury*, 805 F.2d 155, 161 (6th Cir. 1986) (articulating the particularized-need standard under Rule 6(e)(3)(E)(i)). This standard applies even after grand jury proceedings have concluded. *Douglas Oil*, 441 U.S. 211, 222 (1979). Evidence of dismissal of counts against a defendant is not sufficient to warrant the disclosure of grand jury transcripts if "other evidence was presented to the Grand Jury on the remaining count, and [the defendant] has not established any reason to think that evidence would also be tainted." *United States v. Moxley*, No. 1:19-cr-98-15, 2020 WL 4381582, at *1 (N.D. Ohio July 31, 2020). A court has substantial discretion to determine whether grand jury materials should be released. *United States v. Short*, 671 F.2d 178, 183–84 (6th Cir. 1982) (citing *Schmidt v. United States*, 115 F.2d 394, 397 (6th Cir. 1940)).

Defendant did not demonstrate a particularized need to disclose the grand jury transcript before trial, and the dismissal of counts related to Victim 3 does not satisfy his burden. Moreover, the evidence at trial contained no evidence comparable to what occurred with Victim 3. Indeed, no facts adduced at trial suggest anything comparable or any basis that would support unsealing the grand jury transcript. For these reasons, the denial of Defendant's motion to compel does not constitute error or warrant a new trial.

### II.C. Exclusion of Evidence Regarding Victim 3

Similarly, Defendant argues that the pretrial determination to exclude evidence concerning Victim 3 and the dismissed charges relating to him constitutes substantial error warranting a new trial under Rule 33. In Defendant's view, the withdrawn charges "exemplify" the inadequacy of the government's investigation. (ECF No. 68, PageID #650.) Without this evidence, Defendant maintains, the jury was unable properly to determine "the credibility of the witnesses, the investigation, and the overall case against Mr. Cao." (ECF No. 68, PageID #650.)

Notably, the United States maintains that it withdrew the charges relating to Victim 3 not as a concession of error but as a charging decision made "despite the fact that earlier [Victim 3] account activity and transfers were admittedly fraudulent, the account opening at issue in Counts 6 and 14 used a similar modus operandi to other fraudulent transactions, and the victim had earlier denied opening the [account]." (ECF No. 38, PageID #225–26.) In this context, the Court excluded testimony relating to these transactions both to avoid confusion of the issues, which might result in a trial within a trial, and because the dismissed counts were no longer relevant to the charges that remained.

"The decision to admit or exclude evidence rests within the district court's sound discretion." *United States v. Landers*, 925 F.2d 1466 (6th Cir. 1991). Even a court's erroneous decision "with respect to the admission of evidence is subject to harmless error analysis, and it is well settled that an error which is not of a constitutional dimension is harmless unless it is more probable than not that the error materially affected the verdict." *United States v. Givens*, 647 F. App'x 578, 583

(6th Cir. 2016) (citations omitted). A defendant's right to present a complete defense is not infringed so long as the improperly excluded evidence "would not have created a reasonable doubt as to the defendant's guilt." *Id.* (cleaned up).

On the record presented, testimony regarding Victim 3 would not have created reasonable doubt about Mr. Cao's guilt. For one thing, the United States would have disputed the defense position that the circumstances involving Victim 3's recantation were exculpatory. Additionally, the charges on which the jury convicted Mr. Cao were supported by evidence unrelated to Victim 3. For example, Roedel was deceased at the time of the transactions in question, leaving no serious argument that her funds were not misappropriated. The same was true for Gakeler, whose attentiveness to her own accounts triggered the investigation, or Helinski, who had the wherewithal to file a police report. Finally, Defendant had the ability to cross-examine FBI Special Agent Alexandria Baldwin, as well as the investigators from KeyBank and Schwab who testified at trial, to call into question the thoroughness or other aspects of their investigations. Indeed, Defendant did so, and this testimony showed no issues of the sort attending Victim 3 and left the jury with no reasonable doubt of Mr. Cao's guilt on the remaining unrelated charges.

**II.D. Deceased Victims**

Next, Defendant challenges the Court's pretrial determination to allow testimony that many of the victims were deceased. Defendant suggests that this evidence was "not relevant, or conversely, substantially more prejudicial than probative." (ECF No. 68, PageID #653–54.)

In pretrial briefing, the United States opposed Defendant's motion to exclude evidence that certain victims had passed away (ECF No. 36), arguing that their deaths were relevant to explain why they were not available to testify. (ECF No. 47, PageID #273–75.) For this limited purpose, the Court ultimately allowed that testimony.

Evidence that a victim or witness died can be relevant to explain why he did not testify. *United States v. Acceturo*, 966 F.2d 631, 637 (11th Cir. 1992); *see also United States v. Smith*, No. 4:18-cr-285, 2020 WL 1081522, at *2 (M.D. Pa. 2020). Relevant evidence—that which has any tendency to make a fact of consequence more or less probable—is generally presumed admissible. Fed. R. Evid. 401 & 402. However, even relevant evidence may be excluded at trial "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed R. Evid. 403. "Evidence is unfairly prejudicial if it 'makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.' " *United States v. Roberts*, 88 F.3d 872, 880 (10th Cir. 1996).

In this case, the United States unambiguously conveyed to the jury that the victims were seniors over the age of 90 (and in several cases, over 100) whom Mr. Cao never personally encountered. Although their causes of death were not specified, the strong implication was that they died of old age. For these reasons, at trial, nothing

about their passings provoked an emotional response in the jurors or even stimulated particular interest, let alone adversely affected their attitude toward Mr. Cao. Therefore, any prejudicial effect of this evidence is minimal, and Defendant is not entitled to a new trial on this ground.

**II.E. Jury Instructions**

Defendant argues that the jury instructions contained substantial legal error. He points out that the Court indicated during the final pretrial conference that it would include a jury instruction directing jurors not to draw adverse inferences from the victims' deaths but did not give such an instruction. (*See* ECF No. 64.) Significantly, the parties did not propose an instruction to this effect. (ECF No. 51.) Nor did the issue come up at the charging conference. And no party objected or otherwise drew the Court's attention to the absence of this instruction. Still, Defendant now contends that the failure to include such an instruction prejudiced him.

At the charging conference, Defendant objected to the definition for constructive possession in the instructions for the aggravated identity theft charges (Counts 11 through 14), and to indicating the specific transaction giving rise to the charge of engaging in monetary transactions in criminally derived property (Count 15). Defendant renews these objections and advances them as a basis for seeking a new trial. (ECF No. 68, PageID #657–61.)

"A trial court's jury instructions must, as a whole, accurately reflect the law." *Dimora*, 973 F.3d at 502 (citation omitted). A court's decision "may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial."

*United States v. Krug*, No. 3:09-cr-257, 2010 WL 4054155, at *2 (M.D. Tenn. Oct. 15, 2010) (citing *Innes v. Howell Corp.*, 76 F.3d 702, 714 (6th Cir. 1996)).

**II.E.1. Deceased Victims**

In light of the procedural history after the final pretrial conference, the Court views Defendant's arguments on this issue as forfeited. "An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Givens*, 647 F. App'x 578, 582 (6th Cir. 2016) (citations omitted). In any event, Defendant's argument lacks merit under Rule 33's ordinary high standard. Testimony at trial regarding the deaths of certain victims was not prejudicial or remarkable in any way, as already noted.

**II.E.2. Specific Transaction in Count 15**

Defendant argues that, by identifying the particular transaction at issue in Count 15, the jury instruction "lightened the government's burden of proof." (ECF No. 68, PageID #661.) Specifically, he objects to the explanatory sentence: "The government alleges that Defendant committed this crime on or about February 9, 2023, by transferring $50,000 from Defendant's Charles Schwab checking account to Defendant's Charles Schwab brokerage account." (ECF No. 64, PageID #607.)

In context, there is no reason to believe that this sentence was "confusing, misleading, or prejudicial." *Krug*, 2010 WL 4054155, at *2. To the contrary, in a case that included references to numerous transactions, this sentence aided clarity and pointed jurors to the particular transaction they needed to consider against the elements of the offense and the instructions as whole. Indeed, every charge in the

amended indictment corresponded to a particular transaction, and the jury instructions reflected this specificity throughout, not just in Count 15. (ECF No. 64.)

In this respect, the instruction ensured unanimity, by not allowing jurors to think that the government carried its burden of proof based on transactions or conduct not at issue in the charge. It promoted the interests of efficiency by not sending jurors on a search through a voluminous record to identify the transaction on which they should focus (which would likely end with a question to the Court in any event). And, contrary to Defendant's argument, it held the United States to proving each element of the offense beyond a reasonable doubt consistent with the instructions as a whole. Moreover, specifying the particular transaction at issue avoided the need to provide jurors with a copy of the indictment, giving the charging instrument more weight than the law allows. Finally, the prefatory phrase in the instruction ("the government alleges") cannot be read to mean that what follows is established fact. For these reasons, inclusion of the specific allegation does not justify a new trial.

### II.E.3. Constructive Possession

Defendant objected to the including the definition for constructive possession in the instructions for aggravated identity theft (Counts 11 through 14). The instructions stated the elements of the offense, then went on to include the legal definition of possession. (ECF No. 64, PageID #602–06.) Following the pattern jury instructions, the second element of the offense read, "the defendant knowingly transferred, possessed, or used a means of identification of another person without legal authority." (*Id.*, PageID #602; Pattern Crim. Jury Instr. 6th Cir. 15.04 (2025).)

Using the pattern instruction defining possession, the Court instructed the jury that possession may be actual or constructive, with active possession signifying "direct, physical control" and constructive possession involving, among other things, "the right to exercise physical control." (*Id.*, PageID #605.)

At the charge conference, the United States explained that it alleged digital possession, which is not expressly classified as actual or constructive in the pattern instruction. Overruling Defendant's objection to a constructive possession instruction, the Court resolved to provide jurors with the complete legal definition of possession.

Defendant argues that by including the definition for constructive possession, the jury instructions encouraged the misunderstanding that, "because Mr. Cao had access [to victim data], he must have been responsible for the transactions." (ECF No. 68, PageID #659–60.) Defendant maintains that the United States only alleged actual possession and that the concept of constructive possession is misapplied to the present context. (*Id.*, PageID #658.)

However, the language in question does not support Defendant's interpretation. In relevant part, the instruction for constructive possession reads: "[T]he government must prove that the defendant had the right to exercise physical control over the means of identification, and knew that he had this right, *and that he intended to exercise physical control over means of identification at some time, either directly or through other persons*." (ECF No. 64, PageID #605 (emphasis added).) This highlighted language guards against the misunderstanding Defendant fears.

Further, the intent requirement makes clear that access alone does not establish constructive possession. Indeed, the instruction emphasizes intent and that the law requires more than mere presence or access to establish possession:

> For example, if you left something with a friend *intending* to come back later and pick it up, or *intending* to send someone else to pick it up for you, you would have constructive possession of it while it was in the actual possession of your friend. *But understand that just being present where something is located does not equal possession.*

(Id., PageID #606 (emphasis added).)

None of this is to say that the dichotomy between actual and constructive possession applies neatly to the digital world. Through case law and updates to the pattern instructions, the Sixth Circuit can help bring clarity to the issue. But nothing about the imprecision of the traditional legal meaning of "possession" and the instruction given to the jury in this case require a new trial.

**II.F. Hearsay**

At trial, Stacy Ebert, a KeyBank fraud investigator, explained how KeyBank became aware of the fraud scheme in which Mr. Cao was later charged. As part of her testimony, Ebert restated part of Gakeler's fraud complaint and read aloud an email thread in which that complaint was described. (USA Ex. 103.) This testimony included the information that "Beverly Gakeler had stated that she had not enrolled in online banking, liquidated her stocks, or made the transfers at issue." (ECF No. 68, PageID #655.) Defendant objected to this testimony as hearsay, and the Court overruled the objection. Based on this admission of this testimony over his objection, which he claims violates Rule 802 and his Sixth Amendment right of confrontation, Defendant seeks a new trial. (ECF No. 68, PageID #655.)

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay is inadmissible unless an exception applies. Fed. R. Evid. 802. "A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009). Accordingly, where a statement is offered to demonstrate its effect on an investigator and to explain the next steps in her investigation, the hearsay rules do not apply. *United States v. Pugh*, 273 F. App'x 449, 456 (6th Cir. 2008).

The Confrontation Clause of the Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This constitutional provision bars testimonial out-of-court statements unless the original declarant is unavailable and the defendant had a prior opportunity to cross-examine her. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). "A statement is testimonial if a reasonable person in the declarant's position would have anticipated the use of the statement in a criminal proceeding." *United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011). However, to trigger confrontation clause analysis, the statement must also "be used as hearsay"—for the truth of the matter asserted and not for its effect on a listener. *Pugh*, 273 F. App'x at 455.

Ebert's testified as a bank's fraud investigator explaining the course of her investigation. The statements to which Defendant objects occurred at the beginning of her testimony, where she explained what triggered her investigation and

KeyBank's early response to suspicious financial activity. She related Gakeler's fraud complaint because that report effectively started the investigation that uncovered the broader scheme. More specifically, Gakeler's complaint had a significant effect in directing Ebert's behavior and that of her colleagues at KeyBank.

### II.G. Cumulative Error

Even if none of the errors which Defendant advances individually support a new trial, he argues that "the cumulative effect of all these errors produced a trial that was fundamentally unfair." (ECF No. 68, PageID #662.) In raising this argument, Defendant essentially contends that the Court violated his due process rights. *United States v. Eaton*, 784 F.3d 298, 310 (6th Cir. 2015). To prevail on this claim, Defendant "must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Warman*, 578 F.3d 320, 349 n.4 (6th Cir. 2009). Based on the record as a whole, Defendant receive a fundamentally fair trial. Therefore, this argument fails as well.

## CONCLUSION

For all these reasons, the Court **DENIES** Defendant's motion for a judgment of acquittal or for a new trial. (ECF No. 68.)

**SO ORDERED.**

Dated: July 17, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio